**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **MARIA KATSIGIANNIS,** | ) | |
| | ) | **No. 13 C 5168** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Magistrate Judge Michael T. Mason** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This case is before the Court on the parties' cross motions for summary judgment. Plaintiff Maria Katsigiannis seeks a remand or an outright reversal of the Commissioner's decision to deny her request for benefits. The Commissioner seeks summary judgment affirming the decision to deny benefits. For the reasons set forth below, Katsigiannis' motion [19] is denied, and the Commissioner's motion [23] is granted.

## <u>BACKGROUND</u>

Maria Katsigiannis applied for disability insurance benefits ("DIB") on May 17, 2010, alleging that she became disabled and unable to work as of August 29, 2007 due to lupus. R. 138-139. Her application was denied initially and on reconsideration. She requested a hearing before an Administrative Law Judge ("ALJ"), and the case was assigned to Rebecca LaRiccia, who held the requested hearing in Oak Brook, Illinois on February 8, 2012.

1. <u>Witness Testimony</u>

At the hearing, the ALJ heard first from Katsigiannis' attorney, who emphasized that his client worked as a pre-school teacher even after being diagnosed with lupus, but that her symptoms got progressively worse, to the point where she was no longer able to work. He noted that she was diagnosed with lupus, which is accompanied by severe joint pain and stiffness, primarily in her hands, hips, knees, ankles, feet and lower back. R. 38. She was also diagnosed with membranous lupus nephritis, which affects her kidneys; this seems to be in remission, but still causes frequent urination and accidents. R. 38. In addition, her attorney represented, she has decreased bilateral hand strength, respiratory issues (chronic cough and shortness of breath), a compromised immune system and chronic pain and fatigue. R. 38-39. He noted that she has two small children, that her pregnancies complicated her symptoms, that she gets a lot of help from her mother and her family, and that she is unable to work. R. 39. He concluded by saying to the ALJ, "I think it would be up to you to determine if you feel the 14.02 lupus listing could apply. She has the documentation that might be sufficient for that or looking at a less than sedentary RFC, Your Honor." R. 39. Katsigiannis' attorney argued that, ultimately, the case would turn on credibility. R. 39, 66.

Next, the ALJ heard from Katsigiannis, who testified that she was 35 years old at the time, and married with two small children, Kylie, who was five at the time of the hearing, and George, who was 18 months at the time. R. 40. She testified that she completed high school and earned an associates degree in early childhood education; she worked as a pre-school teacher for the Veteran Park District until 2007, when she stopped working because of her condition. R. 40. She testified that, before becoming a

2

teacher, she worked for Sears.  R. 41.

Katsigiannis testified that she quit working in 2007, after being diagnosed with lupus, because she was suffering from terrible fatigue and because, with her compromised immune system, it was a bad idea for her to be working around small children.  R. 42.  She testified that she gets sick easily, has a chronic cough and a constant cold.  R. 42.

She testified that she currently takes Plaquenil (hydrocloro), salsept, prednisone, Ultram, Zoloft, baby aspirin, Claritin and an inhaler.  R. 43.  She testified that the medication makes her nauseous and tired and gives her frequent headaches.  R. 44. She testified that she is in constant pain, though some days are worse than others.  R. 45.  She testified that her pain has gotten progressively worse in her hands and back and that, on a scale of zero to ten, it's about a seven, even with the Ultram.  R. 45.  She testified that the Ultram helps somewhat, but some days it feels as if it isn't working at all.  R. 45.  Without the medication, she testified that her pain would be at a 9 or a 10. R. 45.  She testified that she has noticed decreased grip strength in her hands and is just constantly fatigued, to the point where some days she can't get up at all and other days, when she does get up, she has to lie down or nap again in an hour.  R. 46.  She testified that her mother comes to her house five days a week and helps her a lot; her mother's help allows her to nap even when her son is not napping.  R. 46-47.

She testified that the fatigue keeps her from doing the things she needs to do – like taking care of her kids, cooking and cleaning the house; she testified that, when she is in the middle of a flare up, she is unable to do anything about 90% of the time.  R. 49. She testified that she planned to talk to her doctors at the next appointment about

upping her Ultram to try to address her severe joint pain so that she is not so incapacitated.  R. 49-50.

She testified that she is treated by Dr. Katz, a rheumatologist, and by Dr. Gashti, a renal specialist.  R. 47.  She sees both doctors every three to six months.  R. 47.  She also sees Dr. Kecala, her primary care doctor, regularly.  R. 50.  She testified that Dr. Kecla prescribed Zoloft for anxiety and depression; she also testified that she recently started counseling for her anxiety and depression because she just gets overwhelmed so easily.  R. 50.

She testified that she used to take medication for osteopenia, but stopped because she experienced such bad side effects – namely nausea and bad headaches. R. 51-52.  She also testified that she suffers from allergies, which she believes are weather-related; she experiences sneezing, coughing and watery eyes; the cough is the worst, however, because it lasts for months and the coughing attacks are frequent and debilitating.  R. 53.

She testified that, in any given week, five days out of seven are bad; on a bad day, she rarely gets up, doesn't get dressed and doesn't do much physical activity.  R. 54.  She testified that, if she is feeling okay, she might be able to do some physical tasks around the house for about an hour and then she has to stop and take a nap; then she may be able to go back and do a little more, but would need a break every 20 or 25 minutes or so.  R. 60.

She testified that she still has her driver's license, but doesn't drive much.  R. 55. She will drive her daughter to school occasionally, but does not drive long distances because she gets stiff and experiences lots of pain in her lower back and hands.  R. 55.

She testified that she really does not get out much, except to go to doctor appointments and maybe to her mom's house "for like a birthday or something." R. 55. She testified that she has no hobbies but does have friends, one in particular who comes over for regular visits. R. 56. She testified that she is able to dress and bathe herself. R. 56. She testified that she has to use the bathroom frequently (about 6 to 8 times during the day), and that, if she tries to wait, she will have an accident. R. 60-61.

She testified that she is able to walk, that she does not use a wheelchair or other assistive device, but that sometimes it takes her a while to get going because of the stiffness and the joint pain. R. 56. She has to stretch and try to loosen up for a little while first – as much as 10 to 15 minutes on a bad day. R. 58. She testified that she has pain and decreased strength in her hands, that she is able to write for about 10 or 15 minutes before her fingers get numb and tingly – the same is true for gripping a vacuum or the stroller. R. 57. She testified that she also has trouble lifting heavy things and that the most she can lift is about 24 lbs. R. 57. She testified that she can't hold things for very long and that, on days when her fingers are more sensitive and tingly, it is difficult to work buttons or zippers, but generally she can do that. R. 58.

She testified that she gets general tension headaches and also gets headaches that are more migraine-like, more piercing and shooting in the temple; when she gets the latter, she has to be in the dark because the light makes it worse and makes her feel nauseous. R. 61. She testified that she gets one of the bad headaches about 3 or 4 times a week and that they generally last for about an hour, but can last as long as four hours. R. 62.

When asked whether there was anything else she wanted the ALJ to know,

Katsigiannis stated that

> my condition, since I've been diagnosed, has progressively gotten worse, and it's an autoimmune disease, and I'm just susceptible of getting sick easier. Like, I had a virus set into my face which went into Bell's Palsey, which was just a virus, but for me, it attacks me differently, and it affects me differently and just weird things that you wouldn't think that could happen to you, different viruses that people get colds. If I get a cold, it can affect me differently because of my immune system.
> I can't fight off things like a regular person can, and that's why honestly in my position and being around people, it's a higher risk for me getting sick all the time because I'm always exposed to germs, and with my job and being around people, I would be out sick more than working, and honestly, I don't think any employer would hold me with a job if I was out sick more than working.

R. 59.

Next, the ALJ heard from Ward Kinise, who testified as a Vocational Expert ("VE"). Kinise testified that Katsigiannis' past work as a preschool teacher would be classified as SVP 7, skilled work at the light physical demand level; her past work as a receptionist would be classified as SVP 4, semi-skilled, sedentary physical demand level; and her past work as a sales attendant would be classified as SVP 2, unskilled, light physical demand level. R. 63. The ALJ asked the VE to consider a person who is 35 years old, has an associate's degree in early childhood education and a work history identical to Katsigiannis', is capable of performing work at the light exertional level, needs the ability to alternate between sitting and standing at will, cannot climb ladders, ropes or scaffolds and can only occasionally climb ramps and stairs, can occasionally stoop, kneel, crouch and crawl, and must avoid extreme heat, cold and humidity. R. 63-64. The ALJ asked the VE whether such a person could perform any of Katsigiannis' past work; the VE testified that the sales attendant position would still be feasible, as would other work existing in the national economy, such as a route aide, a messenger,

6

and a page.  R. 64.

Next, the ALJ asked the VE to consider the same hypothetical person, but with the added limitation that the person would have only occasional use of her hands for handling; the VE testified that the page position would still be available, but the messenger position would be eliminated with that additional limitation.  R. 64.

Finally, the ALJ added the limitation that the person would need to take a break every hour for a period of time lasting up to an hour; the VE testified that adding this limitation would preclude all work.  R. 64.  The VE also testified that the acceptable level of absenteeism is one day every three months; beyond that, work would be precluded. R. 65.  Additionally, the VE testified that, if an individual is off task 20% of the workday, she would not be able to perform competitive employment.  R. 65-66.

        2.    Medical Records

In addition to the witness testimony, the ALJ had before her medical records documenting Katsigiannis' treatment.  Katsigiannis was diagnosed with lupus in May or August of 2007, although the original documents reflecting that diagnosis are not included in the record.  R. 445, 446.  Katsigiannis saw Dr. Ruth Kadanoff and her fellow, Dr. Richard Hariman, on August 3, 2007.  R. 269.  At that time, she reported that, since her pregnancy and delivery, she felt very fatigued, started getting more severe headaches and is constantly thirsty; she reported that her legs occasionally cramp and her joints occasionally hurt, and that her eyes were sensitive to the sun.  R. 269. Katsigiannis had a renal ultrasound on August 3, 2007, which was unremarkable.  R. 280.  But Dr. Hariman recommended that she get a renal biopsy, which she did on August 24, 2007.  R. 271, 248.  According to the report from that procedure,

> [t]he kidney biopsy is membraneous GN Stage 3 without any subendi othelial deposits. There were some non impressive meg sangial expansion but not the usual picture you se[e] in Lupus. The serology for lupus is either negative or borderline +ve ANA. There is only one cardiolipin [antibody] present that too in minimal conc. She could be Lupus but possibility may be Phospholipid syndrome and or pure mem[]branous. Without our input she has been started on Cell cept and prednisone by the rheumatologist/. Since her renal functions are normal and the BP is normal at this p[o]int there is no reason for her to see us. Therefore we will d/c her from renal clinic and if there are problems or if rheumatologist so desires we will be happy to see her.

R. 264. She had another renal ultrasound on August 29, 2007, which was also normal. R. 279.

The record includes a December 12, 2007 final pathology report from the Department of Pathology at Rush University Medical Center indicating the pathology findings and indicating that "[a]lthough these findings are not sufficient to make a diagnosis of lupus glomenular nephritis, this possibility should be excluded on clinical grounds." R. 480.

Katsigiannis saw Dr. Robert Katz, a rheumatologist, on January 19, 2009; at that time, she had already been diagnosed with lupus and was complaining about low back pain. R. 409. She reported being treated recently for Bell's palsy. R. 409. According to Dr. Katz, "[h]er review of systems is negative except for poor sleep, stress and nervousness." R. 409. Dr. Katz noted that she was feeling better on prednisone, but otherwise reported no changes. R. 409, 411. Katsigiannis reported feeling stiffness in the morning for about an hour, rated her fatigue at a 4, indicating that it was worse since her last appointment, and she reported bruising. R. 412. She reported having some difficulty getting in and out of bed, getting a good night's sleep and dealing with feelings of anxiety, but otherwise reported no difficulty in her activity level. R. 413.

She rated her pain at a 3 on a scale of 1 to 10 and reported that it interfered significantly with her energy, her normal work and her sleep, and to a lesser extent her mood, her general activity, her concentration, her enjoyment of life and her relations with other people.  R. 414.  She described her pain as "aching," "exhausting," and "tiring" and noted it was in her mid to low back; she also noted that it was alleviated somewhat with rest and medicine.  R. 414.

Katsigiannis saw Dr. Katz again on February 16, 2009 and reported feeling "a lot better" and reported that she was considering getting pregnant in the summer.  R. 405. She reported being fatigued and having some difficulty sleeping, some bruising and an elevated but "better" stress level, but generally rated herself as "better" compared to her last visit.  R. 406.  She reported experiencing pain, on average, at a 3, on a scale of 1 to 10; reported that her condition interfered with her activities at a level of 3, on a scale of 1 to 10; and she reported that her condition interfered with her ability to sleep (5 on a scale of 1 to 10) and with her energy level (4 on a scale of 1 to 10).  R. 407. On the spectrum of doing "very well" and "very poorly," she was about a quarter of the way in on the spectrum from "very well."  R. 408.

Katsigiannis returned to Dr. Katz on May 5, 2009 and reported feeling "ok"; she reported having some difficulty sleeping, some mild pain but no other issues.  R. 402-404.  She saw Dr. Katz again on June 29, 2009; at that time, she wanted to discuss pregnancy and requested a referral for a high risk obstetrician.  R. 400.  She returned to Dr. Katz on November 23, 2009 and reported "feeling well"; she reported having no difficulty or limitations with her daily activities.  R. 397-399.

The record shows that Katsigiannis went to the emergency room at Elmhurst

Memorial Hospital on December 2, 2009, complaining of vaginal bleeding and cramping; she was 7 weeks pregnant at the time and had an ultrasound, which ruled out an ectopic pregnancy. R. 326. She was discharged that same night with instructions for pelvic rest and to see her OB as scheduled the next day. R. 333.

Katsigiannis returned to Dr. Katz on January 18, 2010; at that time, she was 14 weeks pregnant and reported "feeling well." R. 392. She rated her fatigue at a 1 on a scale of 0 to 5 and reported no pain and no limitations in her activities. R. 393-395

Katsigiannis saw Dr. Katz again on April 23, 2010, when she was 28 weeks pregnant. R. 387. At that time, she reported experiencing some fatigue and indigestion, but gave herself an overall assessment of 0, indicating "problems not present today." R. 388. She reported being able to dress herself, get in and out of bed, lift a cup, walk outdoors, bathe, bend down, turn faucets off and on, walk two miles and participate in sports and games without any difficulty. R. 389. She reported doing just slightly less than "very well" on a scale of "very well" to "very poorly" and reported feeling slightly more than "no pain" on a scale of "no pain" to "pain as bad as it could be." R. 389.

In a May 3, 2010 letter sent as a follow up to that appointment, Dr. Katz noted that Katsigiannis'

> sed rate of 60 is high as a marker of inflammation, but C-reactive protein inflammation factor is normal. Liver and kidney chemistries, glucose, and electrolytes are okay. Calcium level is a little low, but that is not really significant. Vitamin D level is somewhat low, so you might take 1,000 IU of Vitamin D over the counter. Urine protein is borderline but fine. Everything else looks okay. You look good. Lupus is stable. Everything else seems fine, but you know you should call any time if you have any questions or problems.

R. 345.

She saw Dr. Katz again on June 21, 2010; at that time, she reported feeling "very tired," having a cough and having difficulty sleeping. R. 383-384. She rated her "overall assessment" that day at a 2, indicating, on a scale of 0 to 5, that she was "better." R. 384. She reported being able to dress herself, get in and out of bed, lift a cup, walk outdoors, bathe, bend down, turn faucets off and on, walk two miles and participate in sports and games without any difficulty. R. 386. She reported experiencing almost no pain in the previous week and generally reported doing just slightly less than "very well" on a scale of "very well" to "very poorly." R. 386. Dr. Katz's follow up letter noted:

> Your blood studies show a high sed rate of 80, normal is up to 20 but the C-reactive protein inflammation factor is normal. Antinuclear antibodies are positive, but other rheumatic disease and autoimmune antibody tests are negative. Everything else looks okay. Call if you need me for anything.

R. 352.

An Arthritic Report dated July 23, 2010 and apparently prepared by Dr. Zenon Kecala, Katsigiannis' primary care doctor, notes Katsigiannis' lupus diagnosis and indicates that, at that time, she reported experiencing pain, stiffness, swelling and fatigue; her grip strength was 2-3/5 on both right and left. R. 341. She also reported significant limitations in doing repetitive reaching, handling and fingering (both right and left), in grasping, turning and twisting objects, in holding utensils, buttoning, picking up a coin, overhead and shoulder level reaching; she also reported that she trips/falls and drops things frequently. R. 341-342. The report indicates that Katsigiannis could stand or walk for short distances, could sit or stand for just 15 minutes at a stretch, would need to include periods of walking around during an 8-hour work day, and would need

to be able to shift positions from sitting, standing, walking, etc. as needed.  R. 342-343.

On August 10, 2010, about three weeks after delivering her second baby, Katsigiannis went to see Dr. Casey Gashti, a nephrologist, on referral from Dr. Katz; Dr. Gashti was monitoring Katsigiannis for her membranous lupus nephritis.  R. 366.  At that time, Katsigiannis complained that, since delivery, she had experienced an onset of pain in her knees, ankles and elbows, which persisted despite Ibuprofen; she also reported that her headaches were back.  R. 366.  She reported that the headaches and joint pain were consistent with a lupus flare, which she hadn't had "in a long time."  R. 366.  She also complained of increased fatigue, but was unsure whether that was attributable to her lupus or to the fact that she just had a second baby.  R. 366. According to Dr. Gashti, Katsigiannis' "most recent creatinine was 0.57 checked on 06/21/2010.  Her complement levels were within normal range however she continued to have a positive ANA with a speckled pattern of 1:80."  R. 366.  Additionally, anti-dsDNA is negative; all other serologies including RA, anti-smith and RNP antibodies are all negative."  R. 367.  In the "Impression/Plan" section of the report, Dr. Gashti noted that Kastigiannis' membranous lupus nephritis

> [a]ppears to be in complete remission and the patient is currently taking prednisone and Imuran.  However given that she does not plan to breast feed we will switch her from Imuran back to CellCept 500 mg bid. . . .  We will check lupus serologies given that she has these new arthralgias and headaches with associated fatigue.  We will also check a UA and urine protein to creatinine ratio.  We recommend her to follow-up in clinic in three months.

R. 367.  An addendum to the report notes "[r]enal function stable, she has no protein. Serologically, she has a slightly low C4 and positive ANA.  Will proceed with the Imuran to CellCept switch given her systemic complaints."  R. 367.

An arthritic report prepared by Dr. Gashti on August 10, 2010 indicates that Katsigiannis has lupus with kidney involvement and experiences pain in her hands and knees, as well as fatigue; Dr. Gashti indicated that Katsigiannis had no significant limitations in doing repetitive reaching, handling or fingering and could sit or stand 2-3 hours at a time.  R. 371-372.  Dr. Gashti also indicated, however, that Katsigiannis experienced fatigue with ordinary physical activity, and that she was "experiencing fatigue and joint pain that are limiting her abilities to perform work."  R. 377-378.

Katsigiannis returned to Dr. Katz's office on August 26, 2010; at that time, she reported "feeling good" but having "achy joints."  R. 382.  She was back on Cellcept.  R. 382.

On September 10, 2010, Katsigiannis presented for an interview and mental status examination with Dr. John Brauer, a clinical psychologist.  R. 445.  Dr. Brauer diagnosed her with a generalized anxiety disorder, noting that her concentration and attention appear to be within normal limits, that her general fund of knowledge appeared to be grossly intact, that her capacity for abstraction was reasonably well developed, and that her judgment appeared to be grossly appropriate.  R. 447.  He based the diagnosis on Katsigiannis' reported "history of anxiety over the past couple of years, with no panic attacks nor agoraphobia" and her description of "a pattern of anxiety" and noted that she was "rather perfectionistic and is having difficulty with accepting the lack of perfection in her home."  R. 447.

The record also includes a Psychiatric Review Technique form dated November 4, 2010, in which a consultant with the SSA, Dr. Donald Cochran, noted the presence of an Anxiety-Related Disorder, not severe.  R. 449.  He also noted that the disorder did

13

not limit her in any way with respect to her activities of daily living, her ability to maintain social functioning, or her ability to maintain concentration, persistence or pace, and gave rise to no episodes of decompensation.  R. 459.  According to the Technique form, Katsigiannis reported that she had "no problem managing her own hygiene and attending to personal needs.  She is able to cook but [also] gets assistance from husband and mother, she is able to drive an automobile, travels independently, shops for family groceries and necessities for her daughter, enjoys reading[,] television, and going out to eat.  Reports experiencing fatigue, does not request [any] assistance for walking."  R. 461.

A physical Residual Functional Capacity ("RFC") Assessment completed by Dr. Vidya Madala on November 4, 2010, indicates that Katsigiannis' "lupus is stable, liver and kidney chemistries 'are okay'."  R. 470.  The assessment notes Dr. Kecala's letter stating that "rheumatic disease and autoimmune antibody tests are negative, Sed rate high and antinuclear antibodies are positive, all else reported 'okay'."  R. 470.  Dr. Madala determined that Katsigiannis could lift and/or carry 20 lbs. occasionally and 10 lbs. frequently; stand and/or walk about 6 hours in a 6-hour workday; sit about 6 hours in a 6-hour workday, with periodic alternation between sitting and standing to relieve pain or discomfort; push and pull without limitation; occasionally climb ladders, ropes and scaffolds; frequently climb ramps and stairs; and frequently balance, stoop, kneel, crouch and crawl.  R.  464-465.  He noted no manipulative, visual or communicative limitations, but noted that Katsigiannis should avoid concentrated exposure to extreme heat and extreme cold.  R. 466-467.  According to Dr. Madala, any limitations noted were "associated with fatigue."  R. 470.  Additionally, the assessment notes that

14

Katsigiannis is "pregnant and exacerbation of condition. Grip strength and mobility impaired [due] to exacerbation with joint swelling. There is no required device for support in ambulation." R. 470.

Katsigiannis returned to Dr. Gashti on December 21, 2010; at that time, she was "fighting a cold and . . . experiencing some arthralgias in both her hands," which she related "to the change in weather." R. 482. With respect to her membranous lupus nephritis, Dr. Gashti noted that Katsigiannis

> has had a complete remission of her membranous and is currently on maintenance immunosuppression. She did quite well through two pregnancies and she currently has a normal renal function with only microalluminuric range proteinuria. She has on occasion had serologic activity but this has not translated into an active lupus nephritis. I understand that she recently had labs drawn at your office which were reportedly normal. This included a urine test as well. To this end I will not repeat her labs and have continued her on CellCept 500 mg bid and prednisone 10 mg per day. I have advised her against taking any nephrotoxic agents such as NSAIDs or aminoglucosides. I have given her a prescription for Ultram for pain management. I've asked her to follow up with me in six months unless otherwise necessary.

R. 483.

Katsigiannis saw Dr. Kecala, her primary care doctor, on January 24, 2011 and reported "feeling badly"; she had a sore throat and bronchitis. R. 548. Dr. Kecala prescribed a Z-pack and tamiflu. R. 556. Katsigiannis saw Dr. Kecala again on March 21, 2011, complaining of wheezing and coughing.

On March 10, 2011, Dr. Katz wrote to Katsigiannis saying "[g]lad you are feeling okay. Your C3 complement is low. Otherwise lupus tests are okay and stable. You heard about the new lupus drug that just got approved, but I think you are doing okay." R. 558.

Katsigiannis returned to Dr. Kecala on September 1, 2011 and then again on September 14, 2001 and reported "feeling very much better," though she was still having occasional coughing spells. R. 549, 551.

A Renal Report signed by Dr. Gashti on February 23, 2011 indicates that Katsigiannis was diagnosed with membranous lupus nephritis after a kidney biopsy in August of 2007. R. 477. The report indicates that Katsigiannis' condition does not limit her ability to perform her activities of daily living or her ability to work. R. 479.

In April 2011, the SSA consultants who had handled Katsigiannis' case completed a reconsideration medical advice form, in which they affirmed their RFC findings. R. 491. According to the report, they found Katsigiannis' statements about her limitations to be only partially credible.

On April 5, 2011, Katsigiannis had a bone density scan with Dr. Katz; it revealed osteopenia in the hip and spine. Dr. Katz observed "[b]one density is stable in the hip, but has gone down some in the spine since the previous scan in 2007." R. 534.

On June 6, 2011, Dr. Gashti completed a form on the physical effects of Katsigiannis' pain, noting that her lupus causes joint and muscle pain that can sometimes be severe; Dr. Gashti checked "yes" when asked if the pain is "disabling to the extent that it would prevent the patient from working full time at even a sedentary position." R. 494.

Katsigiannis saw Dr. Katz on June 20, 2011; at that time she reported having "some joint pain" in her hands and ankles; she reported sleeping well and having an "ok" energy level. R. 529.

On June 24, 2011, Katsigiannis went to the emergency room at Elmhurst

Memorial Hospital complaining of abdominal pain, radiating into her right flank and lower

back.  R. 498.  It turned out Katsigiannis had a 2 cm right adnexal cyst; she was

discharged with a prescription for Vicodin and instructions to return for any further

difficulty and to follow up with her OB/GYN for further evaluation and management of

the cyst if the pain did not resolve.  R. 498-502, 504-509.

Katsigiannis saw Dr. Gashti on June 28, 2011.  According to Dr. Gashti's report,

Katsigiannis was being

> maintained on CellCept 500 mg bid and prednisone 10 mg a day in
> addition to 200 mg bid of Plaquenil for arthralgias.  Both of her children are
> doing well and she has been also doing well from a lupus perspective.
> She has been having some abdominal pain on the right side for
> approximately a month and she went to the Elmhurst ER for evaluation.  A
> CT scan as well as an ultrasound revealed a right adnexal mass and she
> is to see her gynecologist for this.  They put her on Vicodin every 4 to 6
> hours which does not seem to be helping with her pain.  She has no skin
> rash, arthralgias, myalgias or any other signs of a lupus flare at this time.

R. 543.  Dr. Gashti noted that, based on blood work done at Dr. Katz' office a week

earlier, Katsigiannis'

> urinalysis [had] trace protein, moderate blood, 1 to 3 RBC's.  She had a
> normal serum creatinine of 0.6 with a BUN[1] of 11. Her serologies were
> negative including normal complements, negative ANA, ANCA and
> dsDNA.  She had a urine protein to creatinine ratio of only 100 mg/gm.  To
> this end Ms. Katsigiannis continues to be in a complete renal remission
> and therefore I will continue to maintain her CellCept 500 mg bid and
> prednisone 10 mg daily.  She is also on Plaquenil for arthritic symptoms.
> Eventually I would like to decrease her prednisone further to possibly 7.5
> or 5 mg per day however I will do this after her next visit at the end of the
> summer.  For now I've not changed any of her medications.

R. 544.  Dr. Gashti noted that Katsigiannis "has no renal issues that would prevent her

---

[1]BUN refers to Blood Urea Nitrogen.  Healthy kidneys take urea nitrogen out of the blood and remove it in
the urine; if your kidneys aren't working well, the urea nitrogen will stay in the blood.  See Dialysis Clinic,
Inc., Explanation of Lab Values,  www.dclinic.org  (11/17/14).

from returning back to work."  R. 544.

Katsigiannis returned to Dr. Katz on September 8, 2011 for a flare up associated with a virus; she reported increased redness and rash on her face, increased joint pain and stiffness in her hips and legs.  R. 523.  She saw Dr. Katz again on October 10, 2011, and, at that time, she reported "overall feeling better."  R. 519.  She had an intermittent cough and reported having more joint pain since having her second baby; she rated her pain at a 6 on a scale of 1 to 10.  R. 519.

Katsigiannis saw Dr. Gashti on November 1, 2011 and noted that, at that time, she had "no signs of a lupus flare" but did have a persistent cough.  R. 540.  Dr. Gashti indicated that Katsigiannis' membranous lupus nephritis

> is currently in complete remission with a normal renal function and no proteinuria.  Maria had blood work done at Dr. Katz' office on October 11th and this showed a normal serum creatinine of 0.78 mg/dl with a BUN of 14.  Her serologies were remarkable only for a slightly low complement level but otherwise negative dsDNA.  Her prednisone has been increased to 20 mg daily for now given her upper respiratory symptoms.  I will not change any of her medications.

R. 541.  Dr. Gashti's report also notes that Katsigiannis "has no renal issues that would prevent her from returning back to work . . . ."  R. 541.

3.    The ALJ's Decision

The ALJ issued her decision on February 22, 2012, finding Katsigiannis not disabled within the meaning of the Social Security Act.  R. 17-27.  Initially, the ALJ determined that Katsigiannis had "acquired sufficient quarters of coverage to remain insured through December 31, 2012.  Thus, [she] must establish disability on or before that date in order to be entitled to a period of disability and disability insurance benefits."  R. 17.  The ALJ determined that Katsigiannis had not established such disability.  In

particular, the ALJ determined that Katsigiannis had the severe impairments of systemic lupus erythematosus and allergies, which caused more than limited limitations in performing work-related activities, but that she did not have a severe mental impairment.  R. 19.  The ALJ further found that, although Katsigiannis had two severe impairments, those impairments, separately or in combination, did not meet or equal a listed impairment.  R. 21.  The ALJ noted that she had considered and rejected both Listing 3.00 for respiratory system impairments and Listing 14.00 for immune system disorders.  R. 21.

Next, the ALJ determined that Katsigiannis had the residual functional capacity to perform light work, except that she would require the option to sit/stand at will, she could never climb ladders, ropes or scaffolds, could only occasionally climb ramps and stairs and only occasionally balance, stoop, crouch, crawl or kneel and must avoid exposure to extreme heat, cold and humidity.  R. 21.  Based upon this RFC, the ALJ determined that Katsigiannis was unable to perform her past relevant work, but, considering her age, education, work experience and RFC, could perform other jobs that exist in significant numbers in the national economy.  R. 25-26.

    4.    Further Proceedings

Katsigiannis asked the Appeals Council to review the case.  And in support of her request, she offered some additional evidence that she believed was "new and material" to her case.  That evidence shows that, on February 2, 2012, Katsigiannis had a neuropsychological evaluation with clinical psychologist Liz Buhai-Jacobus, Psy.D.  R. 583-585.  According to Dr. Buhai-Jacobus' report, Dr. Kecala referred Katsigiannis for "neuropsychological testing to assess possible cognitive decline related to her Lupus

diagnosis" as "part of a more comprehensive assessment to determine if Maria meets criteria to qualify for Social Security Disability." R. 583. To this end, Dr. Buhai-Jacobus administered several tests, namely: "Diagnostic Review, Test of Variables of Attention (TOVA), Brief Cognitive Status Exam, Wechsler Memory Scale IV, Trailmaking, Ruff 2 & 7 Selective Attention Test, Reyes Auditory and Verbal Learning Test (RAVLT), Mental Residual Functioning Capacity Assessment." R. 583. Dr. Buhai-Jacobus determined that Katsigiannis' test results

> indicate a significant cognitive decline most likely due to her Lupus. In addition to her physical struggles with fatigue and pain, Maria is experiencing moderate to severe deficits in attention, concentration, distractibility, memory and processing speed. This impacts her ability to stay on task, follow directions and learn new material. Maria also experiences anxiety and considerable frustration at her loss of functioning. While pain and sensations of numbness contribute to her difficulties in sustaining attention, concentration, and the speed to compete tasks, there are clear cognitive deficits present that interfere with her daily activities, comprising a cognitive disability.

R. 585.

The new evidence also shows that Katsigiannis saw Dr. Kecala again on February 3, 2012, at which time he upped her Zoloft prescription. R. 578. She returned to Dr. Kecala on February 8, 2012; at that time, she reported being "very upset and worried about her disease; she complained of muscle and joint pain, was worried about her kidneys and worried about her lupus. R. 579. Dr. Kecala advised her to return in 2 weeks. R. 579.

The records submitted to the Appeals Council also include a physical therapy report dated February 8, 2012 in which the PT advises Dr. Kecala that Katsigiannis experienced "constant" pain at a 4-7 on a scale of 1 to 10 in her knees, hands, lower

back, hips and feet.  R. 568.  Her range of motion in her knees and back was within normal limits but painful; her hip flexion was moderately limited with end range pain.  R. 568.  Katsigiannis "demonstrated moderate to severe phasic shaking with all strength testing."  R. 568.  Her grip strength was "poor."  R. 568.  And she "scored 60% on the Back Index for functional disability which indicates severe disability."  R. 569.  A Physical Capacities Evaluation prepared by the physical therapist on February 13, 2012 indicated that Katsigiannis could sit 5 hours in an 8-hour workday and stand/walk 1 or 2 hours, but would need to alternate sitting and standing throughout the day.  R. 570.  She could use her hands for simple grasping, pushing/pulling and fine manipulation but could not use her hands for repetitive tasks; nor could she use her feet for repetitive movements.  R. 570.  According to the physical therapist, Katsigiannis could lift 0 to 5 lbs. frequently and 6 to 10 lbs. occasionally, but could never lift more than 10 lbs.  R. 571.  Additionally, she could occasionally reach above shoulder level, but could never climb, balance, stoop, kneel, crouch or crawl; in fact, the therapist's notes indicated that Katsigiannis "was able to perform all these activities but had a lot of difficulty getting down + up from floor + didn't appear to be able to do them 33% of the day."  R. 571.  Finally, the therapist noted that Katsigiannis suffered from pain and fatigue, both of which were disabling to the extent that they prevented her from working full time, even in a sedentary position.  R. 571-572.

Additionally, a Mental Residual Functional Capacity Assessment completed by Dr. Zenon Kezela[2] on February 13, 2012 indicates that Katsigiannis was "markedly

---

[2]This is not a typo; the form indicates Kezela (typed); the signature is illegible.

limited" in several areas – namely, in the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to work in coordination with or proximity to others without being distracted by them; the ability to complete a normal workday and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and the ability to travel to unfamiliar places or use public transportation. R. 574-576. According to the same assessment, she was "moderately limited" in the ability to remember locations and work-like procedures; the ability to understand and remember very short and simple instructions; the ability to carry out very short and simple instructions; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; the ability to make simple work-related decisions; the ability to accept instructions and respond appropriately to criticism from supervisors; the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; the ability to respond appropriately to changes in the work setting; and the ability to set realistic goals or make plans independently of others. R. 574-576.

The records submitted to the Appeals Council show that Katsigiannis returned to Dr. Kecala on February 22, 2012; at that time, she reported "feeling very much better on Cymbalta"; she complained that she and her children had the flu. R. 580. Dr. Kecala advised her to return in 1 week. R. 580.

The Appeals Council denied her request for review on April 19, 2013, R. 1, 6-8, making the ALJ's decision the final decision of the Commissioner. On July 19, 2013,

Katsigiannis filed suit in this court, seeking review of that decision. The parties

consented to proceed before a United States Magistrate Judge, and the case was

assigned to this Court on August 27, 2013. The parties' cross motions for summary

judgment followed.

## DISCUSSION

An individual claiming a need for Disability Insurance Benefits must prove that

she has a disability under the terms of the SSA. In determining whether an individual is

eligible for benefits, the social security regulations require the ALJ to apply a sequential

five-step analysis. First, the ALJ must determine if the claimant is currently employed;

second, a determination must be made as to whether the claimant has a severe

impairment; third, the ALJ must determine if the impairment meets or equals one of the

impairments listed by the Commissioner in 20 C.F.R. Part 404, Subpart P, Appendix 1;

fourth, the ALJ must determine the claimant's RFC, and must evaluate whether the

claimant can perform her past relevant work; and, fifth, the ALJ must decide whether the

claimant is capable of performing other work in the national economy. *Knight v. Chater*,

55 F.3d 309, 313 (7th Cir. 1995). At steps one through four, the claimant bears the

burden of proof; at step five, the burden shifts to the Commissioner. *Id.*

A district court reviewing an ALJ's decision must affirm if the decision is

supported by substantial evidence and is free from legal error. 42 U.S.C. § 405 (g);

*Steele v. Barnhart*, 920 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "more

than a mere scintilla"; rather, it is "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401

(1971). In reviewing an ALJ's decision for substantial evidence, the Court may not

"displace the ALJ's judgment by reconsidering acts or evidence or making credibility determinations."  *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)(citing *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)).  Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the courts.  *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990).

An ALJ must articulate her analysis by building an accurate and logical bridge from the evidence to her conclusions, so that the Court may afford the claimant meaningful review of the SSA's ultimate findings.  *Steele*, 290 F.3d at 941.  It is not enough that the record contains evidence to support the ALJ's decision; if the ALJ does not rationally articulate the grounds for that decision, or if the decision is insufficiently articulated, so as to prevent meaningful review, the Court must remand.  *Id.*

Katsigiannis argues that the ALJ's decision should be remanded or reversed for three reasons: (1) the ALJ erred in assessing her credibility; (2) the ALJ erred in weighing the expert medical opinions of record; and (3) the Appeals Council was wrong to conclude that the new evidence she submitted was not new and material.  We consider each argument below.

1.    The ALJ's Credibility Findings

The ALJ found, "[a]fter careful consideration of the evidence," "that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms, however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."  R. 22.  As

Katsigiannis points out, this is the exact boilerplate language that the Seventh Circuit criticized in *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012). As Judge Posner explained in *Bjornson*, the template language is problematic because

> the assessment of a claimant's ability to work will often (and in the present case) depend heavily on the credibility of her statements concerning the "intensity, persistence and limiting effects" of her symptoms, but the passage implies that ability to work is determined first and is then used to determine the claimant's credibility. That gets things backwards. The administrative law judge based his conclusion that Bjornson can do sedentary work on his determination that she was exaggerating the severity of her headaches. Doubts about credibility were thus critical to his assessment of ability to work, yet the boilerplate implies that the determination of credibility is deferred until ability to work is assessed without regard to credibility, even though it often can't be. In this regard we note the tension between the "template" and SSR 96-7p(4), www. ssa. gov/ OP_ Home/ rulings/ di/ 01/ SSR 96- 07- di- 01. html (visited Jan. 4, 2012), which states that "an individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence." The applicant's credibility thus cannot be ignored in determining her ability to work (her residual functional capacity, in SSA-speak).

*Bjornson*, 671 F.3d at 645-646.

Here, the ALJ went on to explain why, specifically, she believed Katsigiannis lacked credibility, noting that Katsigiannis testified that her symptoms worsened after her son was born, but that the record did not support that testimony. R. 22. In particular, the ALJ noted that most of the medical records from that time period – July 2011 – described her lupus as "stable." R. 22. The ALJ also noted that there was no support in the record for Katsigiannis' claim concerning her headaches; nor her claim of frequent urination and/or incontinence. R. 22. According to the ALJ, "most of the records show symptoms stability." R. 22.

At first blush this would seem to be precisely the problem Judge Posner flagged in *Bjornson* – by its own regulations, the SSA says that a lack of objective medical

evidence, by itself, is not enough to undermine a claimant's credibility about the limiting effects of her symptoms. Here, however, it wasn't just that the objective medical evidence did not support Katsigiannis' claimed symptoms or that there was a lack of evidence to document her claimed symptoms; rather, what Katsigiannis was reporting to her doctors – as reflected in the medical records – was significantly different than what she was claiming before the ALJ. To her doctors, she generally reported mild symptoms – sometimes not even attributable to her lupus. This is a legitimate reason to discount a claimant's credibility, and we find no fault with the ALJ's credibility analysis.

2. <u>The ALJ's Treatment of the Expert Medical Opinions</u>

As noted above, in July 2010, Dr. Kecala completed an "Arthritic Report" indicating that Katsigiannis experienced pain, stiffness, swelling and fatigue, diminished grip strength, and significant limitations with repetitive reaching, handling and fingering and with grasping, turning and twisting objects, in holding utensils, buttoning, picking up a coin, overhead and shoulder level reaching. R. 341-342. In the report, Dr. Kecala indicated that Katsigiannis could stand/walk for short distances, could sit or stand for just 15 minutes at a stretch, would need to include periods of walking around during an 8-hour work day, and would need to be able to shift positions from sitting, standing, walking, etc. as needed. R. 342-343. In making her disability determination, the ALJ gave "little weight" to Dr. Kecala's July 2010 opinion because he "provided significant limitations that are not support[ed] in the medical evidence, including his own treatment records. Further, he is not a specialist and claimant is treated by rheumatologist Dr. Katz. The claimant's abilities, or lack thereof, are not consistent with claimant's own reports to Dr. Katz." R. 25.

Katsigiannis argues that the ALJ was wrong to give little weight to Dr. Kecala's July 2010 opinion. More specifically, she argues that because Dr. Kecala was her primary care physician, the ALJ was required to consider the checklist of factors spelled out in 20 C.F.R. 404.1527(d) in determining what weight to give his opinion – a checklist that includes the length, nature and extent of the treatment relationship; the frequency of examination; the physician's speciality; the types of tests performed; and the consistency and support for the physician's opinion. Based upon the ALJ's decision, it would seem that she did, in fact, consider these factors. What's more, prior to finding that the opinion was not supported by the medical records, the ALJ described those records in detail. And, quite simply, there is nothing in any of Dr. Kecala's treatment notes to suggest the kind of limitations he included in his July 2010 opinion; nor is there anything in the records from Dr. Katz's office to support such limitations. The Court finds no fault with the ALJ's decision to give Dr. Kecala's opinion little weight and will not remand on this basis.

3.    The Appeals Council's Rejection of Katsigiannis' New Evidence

As explained above, Katsigiannis offered additional evidence before the Appeals Council – namely: (1) a brief by attorney Kristin M. Boyer dated April 17, 2012; (2) Rheumatology Associates Laboratory results dated September 8, 2011; (3) medical records from ARC Physical Therapy dated February 2012; (4) a mental capacity assessment dated February 13, 2012; (5) medical records from Dr. Zenon Kecala dated February 2012; and (6) a neuropsychological evaluation from Dr. Liz Buhai-Jacobus, Psy,D., dated February 2, 2012. R. 10. The Appeals Council considered this additional evidence, as well as the reasons Katsigiannis gave for disagreeing with the ALJ's

decision, but determined that it had no reason under the rules to review the ALJ's decision.  R. 6.  This, in our view, suggests a determination that the evidence was not "new and material."  *See Farrell v. Astrue*, 692 F.3d 767, 771 (7th Cir. 2012).

The Appeals Council will consider "new and material" evidence "only where it relates to the period on or before the date of the [ALJ's] hearing decision."  20 C.F.R. § 404.970(b).  Evidence is considered "new" if it was "not in existence or available to the claimant at the time of the administrative proceeding."  *Schmidt v. Barnhart*, 393 F.3d 737, 742 (7th Cir. 2005) (quoting *Perkins v. Charter*, 107 F.3d 1290, 1296 (7th Cir. 1997)).  And "new" evidence is considered "material" if there "is a 'reasonable probability' that the ALJ would have reached a different conclusion had the evidence been considered."  *Id.* (quoting *Johnson v. Apfel*, 191 F.3d 770, 776 (7th Cir. 1999)).  In a case where the evidence is "new and material" and it relates to the period before the ALJ's decision, the Appeals Council will evaluate the entire record, including the additional evidence, and then review the case "if it finds the [ALJ's] action, findings, or conclusion is contrary to the weight of the evidence currently of record."  *Id.*

Here, ALJ LaRiccia held an administrative hearing on February 8, 2012 and she issued her decision on February 22, 2012.  To be sure, the April 17, 2012 brief from Kristin Boyer was new, in the sense that it did not exist at the time of the hearing or when the ALJ issued her decision.  But the attachments to the report, for the most part, were not new.  The physical therapist's evaluation and report dated February 8, 2012 – the same date as the hearing, could have been submitted before the ALJ issued her decision, but was not; indeed, given that the report was dated the same day as the hearing, it necessarily documented tests and evaluations conducted prior to that date;

28

yet neither it nor the underlying documentation was submitted and neither counsel nor Katsigiannis mentioned that a physical therapy assessment would be forthcoming. Similarly, Dr. Liz Buhai-Jacobus' neurocognitive evaluation was dated February 2, 2012 – six days before the hearing and twenty days before the ALJ issued her decision. Yet no one mentioned it at the hearing. No one even mentioned that Katsigiannis had been evaluated by Dr. Buhai-Jacobus.[3]

   Dr. Katz' rheumatologist lab report dated September 8, 2011 is not new. The February 13, 2012 mental RFC signed by Dr. Kecala and Dr. Kecala's updated records from February 20, 2012, including a list of the medications Katsigiannis takes, are both dated after the hearing date but before the ALJ's decision was issued. These records are at least arguably new. But they are not material. Dr. Kecala's notes indicate that Katsigiannis had a cough and flu symptoms, but was "feeling very much better"; the updated records are consistent with the records before the ALJ and reflect nothing that we think would have changed the ALJ's decision.

   The Mental Residual Functional Capacity Assessment completed on February 13, 2012 is another story. That assessment indicates that Katsigiannis was "markedly limited" in several areas (namely, in the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to work in coordination with or proximity to others without being distracted by them; the ability to complete a normal

_____

[3]The only possible clue was Katsigiannis' testimony that she recently started counseling for her anxiety and depression because she just gets so overwhelmed so easily. R. 50. This hardly foreshadows the kind of decline and deficiencies described in Dr. Buhai-Jacobus' report.

workday and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and the ability to travel to unfamiliar places or use public transportation) and moderately limited in several other areas (in the ability to remember locations and work-like procedures; the ability to understand and remember very short and simple instructions; the ability to carry out very short and simple instructions; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; the ability to make simple work-related decisions; the ability to accept instructions and respond appropriately to criticism from supervisors; the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; the ability to respond appropriately to changes in the work setting; and the ability to set realistic goals or make plans independently of others). R. 574-576. The limitations noted in this report (which appears to have been completed by Dr. Kecala) would seem to be more in line with the picture painted in Dr. Buhai-Jacobus' report.

Katsigiannis argues that the February 13, 2012 Mental RFC Assessment provides support for the July 2010 opinion. But the new report, like the 2010 opinion, seems to come out of the blue when compared to Dr. Kecala's treatment notes. The report from Dr. Buhai-Jacobus provides greater context for the Mental RFC. But Dr. Kecala never references that report (or even the referral) in his assessment. Because of this, we have no reason to think that the ALJ would have given Dr. Kecala's later opinion any greater weight than she gave Dr. Kecala's earlier opinion.

We think it likely that, had it been before the ALJ, Dr. Buhai-Jacobus' report may have made a difference. That report outlines some very specific test results and

indicates that Katsigiannis suffers from a significant cognitive impairment.  It is possible

to imagine that the ALJ might have determined that the evaluation was entitled to less

than full weight, given that it represents a one-time peek at Katsigiannis' condition and

goes far beyond anything Dr. Kecala ever identified – indeed, Dr. Kecala never even

mentioned the need for a neuropsych evaluation; nor does he mention the findings of

Dr. Buhai-Jacobus' report.  But we cannot know how the ALJ would have reacted to the

report because Katsigiannis did not submit it; as noted, she never even mentioned Dr.

Buhai-Jacobus.  And, although that is unfortunate, we cannot say the Appeals Council

was wrong to reject the report.  It was not new.

## CONCLUSION

For the reasons set forth above, the Court denies Katsigiannis' motion for

summary judgment [19] and grants the Commissioner's motion for summary judgment

[23].  The decision of the Commissioner is affirmed.

Date: December 1, 2014

E N T E R E D:

MAGISTRATE JUDGE MICHAEL T. MASON
UNITED STATES DISTRICT COURT